Filed 6/23/25  P. v. Schmitt CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>BRIAN DOUGLAS SCHMITT, SR.,<br><br>     Defendant and Appellant. | A170547<br><br>(Sonoma County Super. Ct. No. SCR7562591) |

Brian Douglas Schmitt, Sr., was sentenced to 30 years to life in prison for his convictions for oral copulation/sexual penetration of a child under 10 (counts one and three; Pen. Code, § 288.7, subd. (b)),[1] and committing a lewd act upon a child (counts two and four; § 288, subd. (a)).  In this appeal, he raises several challenges to evidence admitted by the trial court.  We affirm the judgment.

### BACKGROUND

#### A.

The victim, Jane Doe, is the granddaughter of Schmitt's former girlfriend, Janice.[2]  At the time of the crimes, Schmitt

---

[1] All undesignated statutory references are to the Penal Code.

[2] To protect her identity, we refer to the victim by a pseudonym and to her family members by their first names.

lived with Janice, and Doe periodically spent time with Schmitt when she visited Janice's house. Doe also regularly spent time at the house of her maternal grandmother, Ruth. Doe's parents were going through a custody battle at the time.

One day in July 2022, while at Ruth's house, Doe touched her backside and indicated that Schmitt had molested her. According to Ruth's testimony at trial, Doe said that she had something to tell Ruth and asked her to "please don't be mad." Doe told Ruth that Schmitt "tried to put a finger in the back." He "trie[d] to force it" but Doe's underwear was in the way. Ruth testified that Doe was "shaking" and asked Ruth to " '[p]romise not to tell anybody.' " In response to Doe's disclosure, Ruth was "mad" and started crying.

**B.**

The following month, when she was nine years old, Doe was interviewed by a forensic interviewer who specializes in conducting interviews with child victims or witnesses of crime. The interview, which lasted about 50 minutes, was recorded and played for the jury at trial. During the interview, Doe related that one day, when she was in the middle of watching a movie with Schmitt at Janice's house, Schmitt began touching her private parts. Doe had been sitting in Schmitt's lap, on a reclining chair in the living room, and Janice was not there. Doe was wearing pajamas with shorts and, after Doe paused the movie, Schmitt started tickling her "all around." While Doe was upside down, Schmitt started touching her "private" and her "bottom too." Schmitt was "squishing" Doe's legs. According to Doe, Schmitt touched her under her clothes, put his fingers "[i]n my butt hole and my pee hole," moving his fingers around in a circle. She recounted that "he kept on like digging in there" with his fingers "and then taking it out and then smelling it and then putting [it] back and then smelling." Schmitt told Doe that it smelled "nice." When he was touching her "pee hole," it felt like

2

rubbing.  Doe felt like Schmitt was "torturing" her and she thought it was "disgusting."

Doe said that she was seven or eight when it happened, and estimated that it happened three months before the forensic interview (when she would have been eight years old).  Doe had been "too afraid and scared" to tell anyone because she was worried her family members might start fighting, and she was concerned about what would happen if she told anyone.

## C.

The same day that Doe disclosed the abuse to Ruth, Ruth told Janice, who had come to pick Doe up from Ruth's house.  Schmitt was waiting in the car.  When Janice spoke to her, Doe said that Schmitt had "touched me on my butt and between my legs."  Schmitt had touched Doe over her underwear.  Janice did not ask Doe many questions and "did not ask for specific details."  After learning what had happened, Janice brought Doe back to the house she shared with Schmitt.  Doe stayed at Janice's house for about four days, during which time Janice "never let [Doe] out of [her] sight."  As Janice later explained at trial, she wanted to keep things as "normal as possible" for Doe.

At the end of the visit, after Doe had left, Janice confronted Schmitt about the abuse.  Janice testified that she "might have" said to Schmitt that Doe shared that "you touched her in her vaginal area and in her buttocks."  According to Janice, Schmitt responded, " 'Yes, I did,' " and claimed that he had told her this already.  Janice asked Schmitt to leave her house.  Schmitt "wasn't angry" and "didn't argue" with Janice; instead he agreed to leave.  Janice later testified that Schmitt never denied the allegations.

Ruth and Janice did not tell Doe's mother, Mar, right away about Doe's disclosure, instead waiting about five days.  When Mar found out, she tried to ask Doe "many questions" but the two

3

were both emotional and Doe did not say much. Doe became frustrated and did not want to talk about it. Doe did not tell Mar that Schmitt penetrated her vaginally or anally with his fingers. Doe was not willing to talk to everyone about what happened.

When Doe's father learned of Doe's allegations, he got mad and did not believe she had been abused.

## D.

Doe's account at trial differed in some respects from previous accounts of the abuse. She testified in January 2024 that while she was sitting in Schmitt's lap watching a movie at Janice's house, Schmitt touched her front "private part," which helps her go "pee," with his fingers. She was wearing pajama shorts, and he lifted the bottoms of her shorts up and touched her "private parts" under her clothing. Schmitt was "wiggling" his fingers "around." Doe could not remember Schmitt doing anything else specific with his hands nor could she remember him saying anything. When asked whether she was familiar with a "butt hole," Doe apparently indicated that she was not. When asked whether Schmitt had touched her in "the place that helps you go poop," Doe answered that he did not touch that part.

Doe could not remember how long she waited to tell Ruth, but she estimated that she told her "like two weeks after" the abuse had happened. Doe testified that she told Ruth that Schmitt had touched her under her underwear. Doe did not recall telling Janice that he had touched her over her underwear.

## E.

Once the family notified the police, the police worked with Janice to set up a pretext telephone call with Schmitt, which the police recorded. During the call, Janice told Schmitt that for her to be able to move on, she needed "clarity" and needed to know what had happened. Schmitt responded, "I can't speak of anything in the past. I'm sorry," explaining that his son had

4

advised him not to talk to anyone. When Janice asked him, "Was [Doe] even telling me the truth," Schmitt replied, "I cannot discuss anything from . . . my past. . . . no comment." Schmitt shared, however, that he believed that his marijuana addiction "caused me to do things . . . that I wouldn't normally do . . . if I wasn't out of my mind on marijuana." He added, "I have mental issues, from an early age." During the call, Schmitt also asked Janice to meet him outside of the library with three computers they had shared, explaining, "I just wanna . . . remove everything from . . . the computers." Schmitt recognized that even after he removed everything from the computers, "in some way it'll still be in there[,] [b]ut at least you won't have to see it or deal with it."

The police arrested Schmitt at the library, before Janice could hand over the computers. The police then obtained the computers from Janice, including a Toshiba laptop. The computers were partitioned so that Janice and Schmitt each had separate profiles. Among the documents recovered from Schmitt's partition on the Toshiba laptop were six sexually explicit illustrations. At trial, Sergeant Ronald Flores explained that when he was reviewing the data extracted from Schmitt's partition, the six images caught his attention because "[t]hey depicted obvious computer-generated images of children engaged in sexual conduct."

**F.**

As part of its case, the prosecution introduced testimony from a clinical and forensic psychologist, Dr. Tiffany Anderson, whom the trial court designated as an expert on child sexual abuse. Dr. Anderson testified about "Child Sexual Abuse Accommodation Syndrome," a set of behaviors observed in child victims of sexual abuse. She was not familiar with the allegations against Schmitt and did not offer any opinions as to whether Doe had been sexually abused.

5

**G.**

Schmitt did not present an affirmative defense case.

**DISCUSSION**

Schmitt challenges the admissibility of the six sexually explicit images from his computer; Sergeant Flores's characterization of the six images as depicting "children engaged in sexual conduct"; and Dr. Anderson's testimony on Child Sexual Abuse Accommodation Syndrome. We review Schmitt's evidentiary challenges for abuse of discretion. (See *People v. Gonzalez* (2021) 12 Cal.5th 367, 411 [challenge to admission of lay opinion testimony]; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 170 (*Lapenias*) [challenge to Child Sexual Abuse Accommodation Syndrome evidence]; *People v. Memro* (1995) 11 Cal.4th 786, 864 (*Memro*) [Evidence Code section 1101 challenge].)

**A.**

Schmitt contends that the trial court erred in admitting the six sexually explicit images found on his computer pursuant to Evidence Code section 1101, subdivision (b), because the images were irrelevant and unduly prejudicial. We disagree.

Evidence Code section 1101, subdivision (a), restricts the admission of evidence of the defendant's prior bad conduct to prove his conduct on a specific occasion. Evidence Code section 1101, subdivision (b), however, permits evidence of the defendant's prior conduct "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." Even where the evidence in question is admissible, Evidence Code section 352 grants the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will," as relevant here, create a substantial risk of undue

6

prejudice. "The 'prejudice' which section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues.*' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 275.)

Sexually explicit images, if found in the defendant's possession, may be relevant to prove intent or motive in prosecutions involving sexual assault. (See *People v. Parker* (2022) 13 Cal.5th 1, 39 (*Parker*); *Memro, supra,* 11 Cal.4th at pp. 864-865.) For example, *Memro* held that the trial court did not abuse its discretion in admitting magazines and photographs with sexually explicit stories, drawings, and photographs of prepubescent boys and young adults in the defendant's prosecution for molesting a seven-year-old boy in violation of section 288. (*Memro,* at pp. 864-865.) *Memro* reasoned that the photographs gave rise to a permissible inference that the defendant "had a sexual attraction to young boys and intended to act on that attraction." (*Id.* at p. 865.) As a result, *Memro* concluded that the photographs were admissible because they were probative of the defendant's intent to commit a lewd or lascivious act with the young victim. (*Ibid.*) Further, *Memro* rejected the argument that the photographs—which depicted young boys in sexually explicit poses—were unduly prejudicial. (*Ibid.*) Although the images were "undoubtedly . . . disturbing," their probative value as to the defendant's intent to violate section 288 was "substantial." (*Ibid.*) Similarly, in *People v. Avila* (2014) 59 Cal.4th 496, 518-519, a murder case, our Supreme Court held that evidence that the defendant possessed child pornography and had, shortly before the crime, printed out a story about an adult male having sex with children "was probative of [the] defendant's intent to commit lewd acts on the young murder victim."

In *People v. Page* (2008) 44 Cal.4th 1, 5, 40 (*Page*), our Supreme Court considered the admission of pornographic

7

magazine images of postpubescent young adult women in a prosecution for committing a lewd act on a child in violation of section 288, subdivision (a). *Page* reaffirmed that evidence that a defendant had possessed sexually explicit images may be admissible to prove intent. (*Id.* at p. 40.) But the Court observed in dicta that the probative value of the images in that case was lessened because, among other things, none of the models in the images appeared to be as young as the six-year-old victim, the acts committed against the victim were dissimilar to the acts portrayed in the images, and the defendant did not attempt to conceal or destroy the images. (*Id.* at pp. 40-41.) Ultimately, *Page* declined to decide whether the trial court abused its discretion in admitting the evidence because the defendant had not shown that its admission was prejudicial. (*Id.* at p. 41.)

In *People v. Westerfield* (2019) 6 Cal.5th 632, 686-688 (*Westerfield*), our Supreme Court considered the relevance of child pornography in the context of determining whether a child pornography charge was properly joined with charges for the kidnapping and murder of a seven-year-old girl whose body was found nude. In support of the child pornography charge, the trial court had admitted six short video clips depicting forcible sexual assaults of young girls, along with a photograph depicting a man having sex with a young girl.[3] (*Id.* at p. 684.) In holding that the

---

[3] In *Westerfield*, the prosecution also introduced cartoon or anime images depicting forcible sexual acts with pubescent girls and mature females with girlish features, hairstyles, or clothing. (*Westerfield, supra,* 6 Cal.5th at p. 684.) However, because the anime images were admitted to prove motive and intent in connection with the murder and kidnapping charges but not the child pornography charge, our Supreme Court's analysis of the relationship between the child pornography charge and the other charges for purposes of joinder does not directly address the anime images. (*Ibid.*; see also *id.* at pp. 686-688.)

child pornography offense was sufficiently connected to the kidnapping and murder charges for joinder purposes, *Westerfield* explained that the defendant's possession of pornographic images of children was indicative of his sexual interest in young girls, and was therefore "highly relevant" to explain why he would have kidnapped and murdered his young victim. (*Id*. at p. 687.) *Westerfield* further explained that that there was an evidentiary basis for believing that the defendant's sexual interest in young girls had motivated the kidnapping and killing, even though there was no direct physical evidence that the victim had been sexually abused: among other facts, the girl's body was found nude, her hair was found in the defendant's home bedding, and her handprint was found near the defendant's bed. (*Id*. at pp. 685, 687.) Our Supreme Court rejected the defendant's argument that the child pornography charge was not sufficiently connected to the other charges simply because none of the child pornography depicted the victim herself and there was no evidence that the scenes depicted in the pornography corresponded to the kidnapping and murder. (*Id.* at p. 687.) Instead, *Westerfield* reasoned that a common intent or motivation was sufficient by itself to connect the child pornography to the murder and killing for purposes of joinder, even without "physical evidence or other objectively measurable factors" connecting the pornography to the other charges. (*Id*. at pp. 687-688.)

Recently, in *Parker*, our Supreme Court upheld the admission of images of women without pubic hair or in handcuffs as probative of the defendant's intent and motive to commit rape. (*Parker*, *supra*, 13 Cal.5th at pp. 39-40.) Although some of the images depicted the victim's face collaged onto a model's nude body, some images depicted other women. (*Ibid*.) Given that the victim was found with her pubic hair removed and an injury that could have been caused by a wrist restraint, the images were probative of the defendant's sexual interest and rape fantasy. (*Id*. at p. 39.)

Here, the six sexually explicit illustrations challenged by Schmitt were relevant to prove his sexual interest in young girls. The images depicted prepubescent or pubescent girls with their pubic areas and (in all but two images) their chests exposed; four of the characters are completely flat-chested, while two appear to have breast buds. Three of the images portray sexual assaults of young girls and one image depicts a young girl surrounded by sex toys. Further, the images, which were found on Schmitt's computer, were downloaded and viewed about two months before Doe disclosed that Schmitt had assaulted her. As in *Memro*, because a jury could find, based on the images, that Schmitt was interested in sexual conduct with young girls, the images were probative of his intent to violate section 288. (See *Memro, supra*, 11 Cal.4th at p. 865.) The jury could also reasonably infer from the images that Schmitt was motivated by his sexual interest in young girls, and that his assault of Doe was not an accident or misunderstanding. (See *Parker, supra*, 13 Cal.5th at pp. 39-40.) Schmitt's plea of not guilty put these questions at issue. (See *Memro*, at p. 864.)

Schmitt argues that admission of the images was improper without "some indicia of *specific* similarity between the cartoon images and the facts of the charged offenses," relying on *Page* and *Westerfield*. Schmitt acknowledges that at least one of the images "is related to the specific conduct described by Doe" because it portrays an adult hand touching a young girl's partially exposed crotch over her underwear. Similar to the scene depicted in that image, there was evidence that Schmitt held Doe's legs in place during the assault and touched her vaginal area while she was upside down. Apart from the similarities to that image, Schmitt argues that the only other similarity between the offenses here and the images is that they generally depict young females in sexualized situations.

10

But Schmitt's argument fails to acknowledge the import of the similarity in age between Doe and the characters depicted in the images, which increases the probative value of the images as evidence of his sexual interest in young girls. Unlike in *Page,* where images of postpubescent women were admitted in a prosecution involving a six-year-old victim, here the jury could conclude that the images depicted prepubescent or pubescent characters similar in age to Doe, who was at most about eight years old at the time of the assault. Further, all images could give rise to an inference that Schmitt was sexually excited by young girl's vaginas, which overlaps with the allegations that Schmitt touched Doe's vagina and digitally penetrated her. Young girls' hairless pubic areas and vaginas are fully visible in five of the six images, and in the sixth image, the young girl's pubic area is partially exposed; one of the images is accompanied by dialogue that reads: "Well, what kinda vaggy do you hide here?" Although there were no allegations that Schmitt used a sex toy during the assault or had intercourse with Doe, the images depicting sex toys around a young girl's vagina and intercourse with a young girl could likewise suggest a fixation with vaginal penetration of a young girl. Indeed, that the images were highly probative of Schmitt's sexual interest in girls is reinforced by the fact that he sought to wipe them from his computer shortly after he learned that Doe had reported the abuse. (Cf. *Page*, *supra*, 44 Cal.4th at p. 41.)

The images are certainly disturbing. But so was Doe's account of Schmitt's assault. (See *People v. Ranlet* (2016) 1 Cal.App.5th 363, 375-376 [holding that the defendant's statements indicating his sexual interest in his seven-year-old daughter were no more inflammatory than her testimony describing the defendant's abuse].) The trial court's conclusion that the probative value of the images as evidence of Schmitt's sexual interest in young girls outweighed their prejudicial value

11

was not arbitrary or irrational. We therefore conclude that the trial court did not abuse its discretion in admitting the evidence.

**B.**

Schmitt next contends that the trial court abused its discretion in allowing a police witness, Sergeant Flores, to testify that the six illustrations "depicted obvious computer-generated images of children engaged in sexual conduct" because the testimony constituted improper expert or lay opinion about the age of the characters. We discern no error.

As the People argue, Schmitt forfeited this challenge by failing to object on these grounds below. Before Flores testified, Schmitt had argued against the admission of the images themselves in part on the basis that, in his view, it would be "pure speculation" to characterize the subjects depicted in them as " 'prepubescent girls' " unless expert testimony was introduced "to confirm that these images depict prepubescent children." When the prosecution elicited Flores's testimony that the images depicted "children," defense counsel objected on the ground that the testimony was speculative, but did not raise any objection based on improper expert or lay opinion. Schmitt's failure to lodge a timely and specific objection that the testimony constituted improper expert or lay opinion forfeited the objection. (See *People v. Edwards* (2013) 57 Cal.4th 658, 709; *People v. Panah* (2005) 35 Cal.4th 395, 475-476.)

In any event, his challenge lacks merit because Flores's testimony was not improper lay opinion. Schmitt incorrectly represents that Flores characterized the illustrations as depicting "young children"; he did not. Flores merely described the subjects of the images as "children," and he offered no opinion as to the specific age or level of development of any of the subjects.

To be admissible, expert opinion must be "[r]elated to a subject that is sufficiently beyond common experience that the

12

opinion of an expert would assist the trier of fact." (Evid. Code § 801, subd. (a).) But no expertise is necessary to establish a person's age when the question is merely "whether the individual in question has passed from minority to majority." (See *People v. Caldwell* (1921) 55 Cal. App. 280, 296 (*Caldwell*).) The " '*outward physical* appearance of an alleged minor may be considered in judging of his *age.*' " (*People v. Montalvo* (1971) 4 Cal.3d 328, 335 (*Montalvo*).) Here, Flores's lay opinion that the subjects were "children" was proper because it was rationally based on his own perception of the images and "[h]elpful to a clear understanding of his testimony." (Evid. Code, § 800, subds. (a)-(b).) Flores's explanation that the images "caught [his] attention" because they were images of "children engaged in sexual conduct" helped explain why they were relevant to his investigation of Doe's allegations. And they provided context to help the jury understand Flores's testimony about the pretextual telephone call during which defendant spoke about his desire to "remove everything from the . . . computers."[4]

We are unpersuaded by Schmitt's contention that an expert on the artistic conventions in "anime" was necessary to determine whether the images portray "children," as Flores testified. Whether or not the artist intended the images to depict characters who are "almost 1000 years old," in Schmitt's words, is irrelevant here. Flores did not offer specific ages. The images contain anatomically detailed illustrations of female characters,

---

[4] Schmitt suggests that Flores's characterization of the images was unnecessary to provide context about the pretext call because the court could have permitted a more "general description" of what Flores perceived. However, Schmitt does not provide any example of a description more general than what Flores offered – "images of children engaged in sexual conduct" – and it is hard to imagine a more general description that would have sufficiently provided context for Schmitt's eagerness to "wipe" the computers.

and there is no reason why a lay person is incompetent to form an opinion about whether the females depicted are "children" based on their " 'outward physical appearance.' " (*Montalvo*, *supra*, 4 Cal.3d at p. 335, italics omitted.)

Schmitt asserts that "the age of an *image* of a person is subject to expert opinion," citing *People v. Kurey* (2001) 88 Cal.App.4th 840, 847 (*Kurey*). But *Kurey* held that expert testimony on the age of actors in a film was properly admitted in that case because the experts testified "regarding developmental factors beyond the normal experience and knowledge of the average fact finder." (*Id.* at p. 847.) Here, Flores did not testify to any age-related factors beyond a lay person's expertise. Further, *Kurey* did not hold that expert testimony was always necessary where the question is the age of persons depicted in an image. Although expert testimony as to whether a subject is an adult or a child may be appropriate in borderline cases, this is not a close case. (See *Caldwell*, *supra*, 55 Cal.App. at p. 296; see also *Montalvo*, *supra*, 4 Cal.3d at p. 335.)

In sum, the trial court did not abuse its discretion in admitting the challenged testimony.

## C.

Schmitt challenges the trial court's decision to admit expert evidence concerning the behavior of children who have been sexually abused. We affirm.

## 1.

At trial, Dr. Anderson, the prosecution's expert on child sexual abuse, explained that "Child Sexual Abuse Accommodation Syndrome" (CSAAS) is a term that was coined in 1983 to describe a set of patterns and behaviors observed in treating children who had been sexually abused. CSAAS is not a tool that can be used to diagnose whether a particular child has been sexually abused. Instead, it is an educational tool "to . . .

14

help people better understand how children might react when they've been sexually abused," because "a lot of the behaviors that [sexually abused] children demonstrate . . . are usually counterintuitive to what . . . adults would expect." Dr. Anderson had not reviewed the facts of Doe's case and did not offer any opinion about whether Doe had been sexually abused or not.

CSAAS involves five sets of behaviors: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and unconvincing disclosure; and retraction. With respect to secrecy, Dr. Anderson testified that a child may feel compelled to keep sexual abuse a secret for many reasons, including the unequal power dynamic between the child and the abuser, the child's close relationship with the abuser, threats by the abuser, or fear of upsetting other family members. As for helplessness, Dr. Anderson explained that children "are quite likely to feel helpless to . . . stop what is happening to them," not only because children are smaller and more vulnerable, but because the abuser may be responsible for the child's food, shelter, family stability, or love. Rather than fight back against the abuse, children may freeze during the abuse and feel like they are physically unable to move. With respect to entrapment and accommodation, Dr. Anderson testified that although the child may feel trapped, they may nonetheless take steps to cope with the abuse, whether it's trying to lock their bedroom door, wearing extra layers of clothing, or dissociating or blanking out while the abuse is happening. Further, a child who copes by disassociating during the abuse may have trouble "accurately remember[ing] precise details." With respect to disclosure, Dr. Anderson explained that it is "quite common" for children to delay—whether by weeks, months, or years—disclosing that they have been sexually abused. In addition, when children do disclose abuse, adults may find their account unconvincing because children "oftentimes" display "neutral emotion" when disclosing abuse. In addition, children may also engage in

15

piecemeal or incremental disclosure, in which they share some details but then "take a step back from" disclosing because of adults' reactions to their disclosure. Finally, with respect to retraction, Dr. Anderson explained that "some children" may retract their allegations or a particular detail after they have disclosed abuse, particularly "when the child does not like the reaction" to the disclosure, as when a parent has a strong emotional reaction.

According to Dr. Anderson, "[w]e know that these behaviors can exist among children" who have been sexually abused, but not all children will exhibit all five categories of behavior; some may only display one or two. She testified that "for the most part it is quite common that I see at least a few of these behaviors among the children who I work with." A child who has been abused "may or may not respond with any of these five behaviors." Further, children who have not been abused, such as those with emotional issues or behavioral dysregulation, may also display these behaviors.

At the conclusion of Dr. Anderson's testimony, the trial court instructed the jury that her "testimony about child sexual abuse syndrome is not evidence the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony."

**2.**

Schmitt contends that the child abuse accommodation syndrome evidence is not sufficiently reliable under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*), but we disagree that the *Kelly* test is applicable here.

*Kelly* held that a "new and emerging technique" used to identify a person's voice—" 'voiceprint' " technology—was

16

inadmissible absent a threshold finding that the technology had "achieved that degree of general scientific acceptance as a reliable identification device which will permit the introduction of voiceprint evidence" in California courts. (*Kelly*, *supra*, 17 Cal.3d at pp. 27-28, 30-31.) In *Kelly*, the defendant was convicted of extortion based on making anonymous phone calls recorded by the police, and voiceprint evidence was used at trial to establish that the defendant was the caller. (*Id*. at p. 28.) Our Supreme Court held that because the prosecution had failed to establish that voiceprint technology had gained general acceptance in the scientific community, the evidence was not admissible for purposes of identifying the defendant's voice. (*Id*. at pp. 32, 40-41.)

The *Kelly* test applies to situations in which the prosecution seeks to rely on "a novel method of proof." (See *Kelly, supra,* 17 Cal.3d at p. 30; see also *People v. Stoll* (1989) 49 Cal.3d 1136, 1156 (*Stoll*) [explaining that the *Kelly* test applies where a new "technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury"].) Here, not only is CSAAS not novel, but the evidence was not admitted or used in this case as a method of proving any "definitive truth" (*Stoll*, at p. 1156); instead the evidence was admitted to educate the jury on misconceptions about the expected behavior of child abuse victims.[5] Accordingly, the *Kelly* test is not applicable where, as here, the CSAAS evidence is introduced to assist the

---

[5] For this reason, we reject Schmitt's contention that CSAAS evidence is "self-fulfilling" in that regardless of how the child behaves, it "is somehow indicative that the child has been sexually abused, or, alternatively, that the child has not been sexually abused." As reflected in the trial court's instruction to the jury and the prosecution's closing argument, the CSAAS argument was not admitted for the purpose of diagnosing whether or not Doe had in fact been abused.

jury in evaluating the victim's credibility, and the expert's opinion was based on her clinical experiences and review of the professional literature. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 173; *People v. Munch* (2020) 52 Cal.App.5th 464, 473 (*Munch*).) Such testimony need only "meet[] 'traditional standards for competent expert opinion, without . . . additional screening procedures' [under *Kelly*.]' " (*Munch*, at p. 473; see also, e.g., *People v. Harlan* (1990) 222 Cal.App.3d 439, 448-449.)

Consistent with this approach, our Supreme Court held in *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*) that even though analogous rape trauma syndrome evidence failed the *Kelly* test for reliability as a scientific method of diagnosing whether a particular individual was raped, evidence about the syndrome was nonetheless admissible to dispel misconceptions about rape victims' behavior.[6] (See *Bledsoe*, at p. 251; see also *People v. Brown* (2004) 33 Cal.4th 892, 905 (*Brown*).) Relying on *Bledsoe*, *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*) recognized that expert testimony on common reactions of sexually abused children is admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,' " although such evidence is *not* admissible to prove that an alleged victim has been sexually abused. (*McAlpin,* at pp. 1300-1301.) It is now well established in California courts that evidence about the behaviors observed in child abuse victims is relevant and admissible to help the jury evaluate the alleged victim's credibility, even if such evidence does not qualify as reliable under *Kelly* as a method for

---

[6] *Stoll* later explained that *Bledsoe* assumed without deciding that the *Kelly* test applied to rape trauma syndrome evidence, because the parties did not dispute the application of *Kelly*. (See *Stoll*, *supra*, 49 Cal.3d at p. 1161.) *Bledsoe* never held that the *Kelly* test applied to the rape trauma syndrome evidence at issue there. (*Stoll*, at p. 1161.)

determining whether a child has suffered sexual abuse. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 391; see also *Brown*, at p. 906; *McAlpin*, at pp. 1300-1301; *Lapenias*, *supra*, 67 Cal.App.5th at p. 171; *Munch*, *supra*, 52 Cal.App.5th at pp. 468-470, 472-473.) Further, notwithstanding Schmitt's citation to out-of-state cases questioning the validity of CSAAS evidence, as Schmitt acknowledges, such evidence is admissible in at least "forty states and the District of Columbia." (See, e.g., *Munch*, at pp. 471-472; see also *McAlpin*, at p. 1301; compare, e.g., *State v. J.L.G.* (2018) 234 N.J. 265, 271-272 (*J.L.G.*) [rejecting the admission of CSAAS evidence in New Jersey courts], with *Munch*, at pp. 470-471 [criticizing the reasoning of *J.L.G.*].)

### 3.

Schmitt next contends the CSAAS evidence was not relevant, either to dispel misconceptions about the behavior of child victims of sexual abuse or to explain how Doe behaved. We conclude that the trial court did not abuse its discretion in admitting the evidence.

First, to the extent Schmitt asserts that CSAAS evidence is no longer necessary because "attitudes and beliefs about child sexual abuse have changed," that contention fails because Schmitt points to no evidence in the trial record supporting such a conclusion. (See *Lapenias*, *supra*, 67 Cal.App.5th at pp. 172-173.)

Second, the CSAAS evidence was relevant because the jury could have reasonably concluded that Doe had displayed several of the component behaviors: secrecy, helplessness, delayed and piecemeal disclosure, and retraction.

The record contains evidence that Doe initially felt compelled to keep the abuse a secret. For example, Doe told the forensic interviewer: "I didn't wanna tell because I was too afraid and scared." She explained that she was "scared" about the

19

consequences of disclosing the abuse and she was concerned her family members would fight over it. Consistent with Doe's account, Ruth testified that when Doe first told her about the abuse, Doe said "please don't be mad" and asked her to " '[p]romise not to tell anybody.' "

Dr. Anderson's testimony on helplessness was also relevant in light of the evidence that Doe did not resist during the assault. Even though Doe felt like Schmitt was "torturing" her and "it felt disgusting," she explained in the forensic interview: "I didn't tell him to stop because . . . I thought he was having a great time."

Schmitt concedes that Doe's disclosure was delayed because she did not immediately disclose the abuse. Doe's disclosures were also arguably piecemeal: when she spoke with Ruth, Janice, and Mar, when she participated in the forensic interview, and when she testified at trial, she shared accounts with varying levels of detail about the abuse, some of which Schmitt argues were inconsistent.

Schmitt argues that there is no evidence that Doe ever recanted her allegations that Schmitt abused her. But as Dr. Anderson's testimony reflected, a retraction need not be complete. Some victims of child abuse may partially recant based on the responses of those around them: "a child may share a detail and then later say oh no, that didn't happen." Here, Doe shared with the forensic interviewer that Schmitt had anally penetrated her with his fingers, but later denied that in her trial testimony. The record also contains evidence, for example, that Doe had previously seen her mother crying when she was recounting the abuse.

We disagree with Schmitt's contention that there was no need to rehabilitate Doe's credibility because there was no evidence that she acted inconsistently with having been abused. Doe sought to keep the abuse a secret, did not immediately report the abuse, did not resist during the assault, did not share

20

identical accounts each time she made a disclosure, and retracted a key allegation.  For example, in closing arguments, the prosecution addressed Doe's testimony that Schmitt did not touch her anus by suggesting that "maybe she's changing her testimony based on a reaction from a family member," specifically referencing Mar's emotional reaction to hearing Doe recount the abuse.  Schmitt, in turn, relied on the inconsistencies in Doe's accounts to argue that she had told "lies."  He argued to the jury that "[t]he result of that [forensic] interview was a hideous tale that is so completely inconsistent with what was said before that it simply cannot be true."  Schmitt emphasized that "Jane's initial reporting to at least three other people was various versions of Brian playing with her and trying to touch her over the underwear . . . but now all of the sudden she's saying this other stuff."  And Schmitt told the jury: "You heard from Jane. You heard significantly changed testimony and lack of memory in which you can only conclude that there is reasonable doubt as to what actually happened.  You heard a bunch of allegations completely inconsistent and contradictory, a general complaint of molestation unsupported by other evidence and in contradiction with each recounting."  In sum, because Doe's "credibility [wa]s placed in issue due to [her] paradoxical behavior," the CSAAS evidence was relevant here.  (See *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)

## DISPOSITION

The judgment is affirmed.

BURNS, J.

WE CONCUR:


JACKSON, P. J.
CHOU, J.


*P. v. Schmitt (A170547)*

21